## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AUTOMATED TRANSACTIONS LLC, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-043-SLR |
| | ) | |
| IYG HOLDING CO., 7-ELEVEN, INC., | ) | **JURY TRIAL DEMANDED** |
| VCOM FINANCIAL SERVICES, INC. and | ) | |
| CARDTRONICS USA, INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants-Counterclaimants. | ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
Fax: (302) 658-1192

*Attorneys for IYG Holding Co.,*
*7-Eleven, Inc., Vcom Financial*
*Services, Inc. and Cardtronics, Inc.*

OF COUNSEL:

Eric J. Lobenfeld
Ira J. Schaefer
Arun Chandra
Brian G. Strand
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

Dated: October 8, 2010
Corrected Version Dated: October 18, 2010
Public Version Dated: October 28, 2010
987634 / 30232

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ......................................................................................... 1

    The Patents-in-Suit ................................................................................ 3

    Background Of The Technology .......................................................... 4

        What is the Internet? ....................................................... 4
        What is TCP/IP? ............................................................. 5
        What Are The Layers in a Network .................................. 7
        What Is The Difference Between the Internet and TCP/IP? ............. 8

    Legal Standards ..................................................................................... 10

        Claim Construction Generally ........................................... 10

    Construction of Means-Plus-Function Claim Terms ...................... 11

    Person Of Ordinary Skill In The Art .............................................. 12

    Claim Constructions ............................................................................ 13

CONCLUSION ........................................................................................... 35

## TABLE OF AUTHORITIES

CASES

*Aristocrat Tech. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) .......................................................... 12, 20

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    296 F. 3d 1106 (Fed. Cir. 2002) .......................................................... 11, 12

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) .......................................................... 12

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
    324 F.3d 1308 (Fed. Cir. 2003) .......................................................... 11

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) .......................................................... 10

*Philips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 10, 11

*Welker Bearing v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008) .......................................................... 12


STATUTES

35 U.S.C. §102(e) .......................................................... 16

35 U.S.C. § 112 .......................................................... *passim*

## INTRODUCTION

The threshold claim construction issue is what it means to be connected to the Internet. As the Court will see, assuming the named inventor of the patents-in-suit, David Barcelou, invented anything (defendants will show he did not), it was combining in a single unit a traditional automated teller machine ("ATM") with an Internet kiosk that would allow consumers to both engage in traditional ATM services (cash withdrawal, check cashing, etc.) and access the Internet to engage in what the specification calls "retail services," such as purchasing flowers, theater tickets and a host of similar services specifically identified in the specification. JA 13, at pg 1179-80. '457 Re-examination Appeal Brief at pp. 3-4.[1]

During discovery, plaintiff Automated Transactions LLC ("ATL") realized that the accused infringing Vcom ATMs did not, in fact, permit consumers to access the Internet. Instead of dropping the case as it should have, ATL decided to argue that accessing the Internet does not mean what the patent says, what the Examiner understood or, indeed, what virtually anyone knows and understands it to mean. ATL now takes the wholly untenable position that *any* network that uses a certain network protocol, called TCP/IP, meets the requirement of connection to the Internet. However, as explained in detail below, ATL's position is baseless and should be rejected by the Court. In that event, as explained in defendants' Motion for Summary Judgment of Non-Infringement, the Court can dispose of this entire case on that basis by holding no claim infringed, as a matter of law.

Almost everyone is familiar with ATMs, typically located at a bank or a convenience store, that have a slot for your ATM card, a display (often a touch screen), and a keypad. The slot, display and keypad are the user interface. You use the ATM by inserting the ATM card into

---

[1] Exhibits referenced in this brief will be submitted by the parties as part of a Joint Appendix.

the slot, entering a PIN code on the keypad and selecting a function on the display. You may first check the balance in your account and then withdraw some cash, for example, $40. If you request it, you will receive a printed receipt. At times when using an ATM not owned by your bank, the withdrawal of cash from your bank account will incur a charge. Because of the way the ATMs are connected in networks, you can use an ATM of one bank in New York City even though your account is with another bank in Wilmington. One of ordinary skill in the art and the Examiner knew what an ATM was at the time of the effective filing date of the patents-in-suit, May 10, 1996. If the ATM gave the user access to the Internet through the display and keypad, people would be able to send a message to another person, go to google.com to do a search, go to facebook.com to see what their friends were doing, or go to amazon.com to buy something, or utilize other Internet functionality, such as downloading files from public File Transfer Protocol ("FTP") sites.

That was the patentee's idea and the preferred embodiment which he claimed – the embodiment of Figure 3b which is the combination of an ATM and an Internet kiosk. See JA 1, Abstract, '457 patent, column 1, lines 48-55, column 4, lines 42-43; JA 13 at pg 1179-80; JA 13, Appeal Brief at pp. 3-4. Prior to the patentee's alleged invention, Internet kiosks were known and were primarily used in airports and hotels to allow travelers to check their email accounts. Typically, one would insert a credit card in the kiosk, purchase access time, e.g., 15 minutes of time online, and the kiosk would then connect you to the Internet so that you could reach the Internet address of various email providers such as AOL, Compuserve, Prodigy, Delphi, etc. DA 17, Lucantoni Invalidity Report 47, DA 16 Lucantoni Non-Infringement Report ¶ 36 (See, e.g., DA 25, prior art U.S. Patent No. 5,602,905; DA 26, Barcelou Deposition Transcript at 414:2-18.)

The patentee called this combination an "integrated banking and transaction apparatus" ['457 claim 1] or a "single automated transaction machine" ['457 claim 9].

As noted above, the problem for ATL is that the accused products, the 7-11 Vcom ATMs, bear no relation to the disclosed and claimed combination of an ATM and an Internet kiosk. Most importantly, the Vcom ATMs do not allow the user to access the Internet. ███████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

## The Patents-in-Suit

The genesis of the patents is a provisional application 60/017,533 that was filed on May 10, 1996 in the USPTO. After that was filed, a PCT application PCT/US97/08089 was filed on May 9, 1997 claiming priority to the provisional application. The PCT application was converted into a U.S. application Serial No. 09/180,558 on November 6, 1998, identifying David Barcelou as the sole inventor. The 09/180,558 application issued into U.S. Patent 6,945,457 ("the '457 Patent") on September 20, 2005. The '457 Patent is the original patent-in-suit.

Prior to the issuance of the '457 patent, a continuation application Serial No. 11/123,982 was filed on May 6, 2005. While that application was still pending, another continuation application, Serial No. 11/818,217 was filed on June 13, 2007. Another round of continuations of 11/818,217 were filed on October 31, 2007. Of those continuation applications, Serial No. 11/981,920 issued into the '158 patent in suit; Serial No. 11/981,965 issued into the '248 patent in suit; Serial No. 11/981,966 issued into the '850 patent in suit; Serial No. 11/981,968 issued

into the '420 patent in suit; and Serial No. 11/982,241 issued into the '677 patent in suit (hereinafter the "Continuation Patents"). Approximately 20 other continuation applications (hereinafter the "Continuation Applications") were filed on that same day. The disclosures of the Continuation Patents and the Continuation Applications are identical to the '457 Patent.

After this litigation was started, a third party, NCR Corporation, requested reexamination of the asserted claims of the '457 patent in suit. That reexamination has Serial No. 90/008,323 and is pending. The asserted claims have been finally rejected and the final rejection was appealed to the USPTO Board of Appeals. Oral argument was heard on August 4, 2010 and ATL is awaiting a decision by the Board. The prosecution file histories of the '457 patent, the reexamination, and the Continuation Applications are relevant to the construction of terms in the asserted claims, and are cited throughout this brief.

## Background Of The Technology

### What is the Internet?

A review of the patents-in-suit, all of which have the same drawings and specification, reveals a very thin disclosure of a combination of an ATM and Internet kiosk and the way the combination is connected to the Internet. As the Court will see, ATL's ploy to circumvent the "access to the Internet" requirement for all of the asserted claims is to argue that, by using the communications protocol TCP/IP, the Vcom ATM's are thereby connected to the Internet through the claimed "Internet interface." ████████████████████████████

████████████████████████████████████████████████

████████████████████████

A little background about networks and the Internet should be helpful. The Internet is a public network that is logically linked together by a globally unique address space. That means

that every device has a unique address that anyone can access to be contacted over the Internet. The Internet uses standard protocols to allow the billions of worldwide users to communicate. While many use the term "World Wide Web" (Web) synonymously with the Internet, they are different. The Internet is a hardware and software infrastructure that provides connectivity between computers, while the Web is a service communicated over the Internet. The Web is a collection of interconnected documents and other resources that are linked by hyperlinks and addressed using uniform resource locators (URLs). Prior to the patentee's alleged invention, the Internet became the preferred fulfillment of the so-called "information superhighway." (See, e.g., DA 30, U.S. Patent No. 5,987,505, column 1, lines 51-57; DA 27, U.S. Patent No. 5,781,632, column 1, lines 15-19.) DA 17, Lucantoni Invalidity Report ¶ 48.

The origins of the Internet go back to the 1960s and 70s when the U.S. government was seeking to create a network called ARPANET. An early development in that network was the decision to use a "packet" based switching network rather than the traditional circuit based switching network. Packets are individual self-contained groups of data. DA 17, Lucantoni Invalidity Report ¶ 49.

After the designers of ARPANET decided to use a packet based network, it was then necessary to develop a protocol which every computer connected to the network would have to run so that they could all talk to each other. The protocol decided upon was based upon a suite of protocols called TCP/IP, and the ARPANET network switched over to it in 1983. DA 17, Lucantoni Invalidity Report ¶ 49. (In this context, a protocol is a set of rules governing how the communications will be controlled.) DA 23, IEEE Dictionary at p. 882.

### What is TCP/IP?

TCP/IP is a set of protocols that is composed of two parts: the internet protocol (IP), a protocol that routes packets through the network to recipients having the packets' destination IP

addresses (which we will explain later is a "layer 3" protocol), and the transport control protocol (TCP), a protocol that ensures reliable delivery of IP packets through, e.g., acknowledgement messages for properly-received packets and retransmissions of dropped or corrupted packets (which we will explain later is a "layer 4" protocol). DA 17, Lucantoni Invalidity Report ¶ 53. Because TCP/IP was an open (non-proprietary) protocol, it was rapidly adopted by both public and private industry. In the 1980's, the packet based Ethernet network protocol became popular for local area (private) and wide area networks. Ethernet defined the layer 1 and layer 2 protocols for a communication so that it could operate with layer 3 and layer 4 protocols such as TCP/IP. Users of the Ethernet network adopted TCP/IP as the layer 3 and layer 4 protocol of choice. By the 1990's many computers had "Ethernet cards" that allowed the computers to connect to hubs, switches, or routers for connection to local area networks or the Internet. The familiar Ethernet connector at the back of a laptop is typically used to connect the laptop to a cable modem for connection to the Internet. DA 17, Lucantoni Invalidity Report ¶ 56.

As the TCP/IP protocol became more widely used, particularly in combination with the use of Ethernet network cards, businesses with large networks started to adopt it. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

As should be obvious from the foregoing discussion, TCP/IP is not the Internet and the Internet is not TCP/IP. The following example explains the distinctions between protocols, such as TCP/IP, and the Internet itself.

### What Are The Layers in a Network?

We all are familiar with the "telephone" system used by children in the old days. Two children in neighboring houses (Alice and Billy) run a string between the two houses and put a cup at each end.



They can then talk to each other by transmitting vibrations along the string which are converted into sound in the cups. Although there are only two persons connected to the string telephone, it is nevertheless a network with two "nodes" (the two cups) and with a communications protocol. Obviously, it is a private network because no one else can connect to it. DA 16. Lucantoni Non-Infringement Report ¶ 84.

In the children's network, the string is the communications medium, and the communications protocol for the network has two layers: the physical layer (layer 1) is the vibrations, and the medium access layer (layer 2) is the set of rules that Alice and Billy must follow. The rules are: the children cannot talk simultaneously because the vibrations will "collide" on the wire, so they must wait until the other stops talking to speak. DA 16, Lucantoni Non-Infringement Report ¶ 85.

The protocol can have higher layers. Layer 3 is called the network layer and is used to route messages. If, for example, Billy had another "telephone" with the child in the next house (Charlie), Alice can send messages to Charlie by telling Billy, "tell Charlie [whatever the message may be]." Billy would know by the prefix of the message ("tell Charlie") that he should "route" this message to Charlie by repeating the message over his telephone line with Charlie.

The layer 3 "routing" information is in the same "format" as the rest of the message (both are words in the children's language, i.e., English), but the words used in the layer 3 prefix have a special meaning to the sender and receiver.  In the lexicon of network engineers, the entire message, including the layer 3 routing information, is "encapsulated" in the vibrations that travel along the string.  DA 16, Lucantoni Non-Infringement Report ¶ 86.

Layer 4 is the transport layer and is used to ensure that messages are properly delivered. Alice may talk into her string telephone to Billy and wonder if Billy heard her message (or if he is on his end of the line at all).  Thus, Alice and Billy may agree that the listener will say "ok" to let the speaker know that the listener heard the message.  That is known as an "acknowledgement."  If Billy does not acknowledge Alice's message, Alice may repeat the message until either Billy acknowledges the message or Alice decides that Billy is not on the line and gives up.  That is known as a "retransmission."  Acknowledgement and retransmission are layer 4 functions.  DA 16, Lucantoni Non-Infringement Report ¶ 87.

### What Is The Difference Between the Internet and TCP/IP?

Now bringing us into 2010, if we substituted two computers for the cups and a wire cable for the string, we would still have a private network with two nodes, it would just be governed by a different protocol.  For example, both computers could have Ethernet cards and be connected by an Ethernet cable.  The layer 1 and layer 2 protocols would be the Ethernet protocol for transmissions over a wire.  Assuming that both computers were running a conventional operating system such as Windows, the upper layers of the protocol (layers 3 and 4) would be TCP/IP. The coding of the TCP/IP protocol would be encapsulated in the Ethernet layer 1 protocol, just as English language speech would be encapsulated in the vibrations in our string telephone example.  Many networks, small ones with two nodes or larger ones with hundreds or thousands of nodes, use TCP/IP as a communication protocol, in large part because the Ethernet protocol is

so common and TCP/IP is the layer 3/layer 4 protocol of choice with the Ethernet protocol. (See DA 17, Lucantoni Invalidity Report at ¶ 56.) In accordance with the TCP/IP protocol, each of the computers in the network will be assigned a unique IP address. An example of an IP address is a number in the form 123.45.67.89. DA 16, Lucantoni Non-Infringement Report ¶ 88.

In our example, if the two computers were connected to nothing else (only to each other), there is no question that the computers are not connected to the Internet. By the Internet, we mean the public network that is logically linked together by a globally unique address space that allows one to address sites by the use of domain names such as google.com, amazon.com or facebook.com, to surf the Web, and to download files from public FTP sites. DA 16, Lucantoni Non-Infringement Report ¶ 89.

Although the two computers are unquestionably not on the Internet, they are using TCP/IP to communicate and have assigned IP addresses. The term "IP" in that phrase stands for "internet protocol," but the term "internet" (with a small i) is not the same as "the Internet" (with a capital I). Rather, "internet" refers to connecting networks as in "inter-networking." (See, e.g., DA 29, http://en.wikipedia.org/wiki/Internetworking (last accessed October 5, 2010).) Therefore, the use of TCP/IP protocol by a network certainly does not mean that the network is the Internet or that a computer on that network is connected to, or can access, the Internet. DA 16, Lucantoni Non-Infringement Report ¶ 90.

In our example above, the two computers communicate with each other by using their respective IP addresses, but they cannot connect to the public network known as "the Internet" or access sites at domain names such as google.com or facebook.com. They certainly do not have an "Internet interface" that allows them to access "the Internet" to contact a spouse, nor make

purchases of goods or services on web sites like amazon.com. DA 16, Lucantoni Non-Infringement Report ¶ 92.

Now let's expand the example. Suppose Alice's computer has another input that allows it to be connected to a cable modem and to an Internet Service Provider such as Time Warner Cable. That connection is completely separate from the network connection to Billy's computer. Alice can now run Internet Explorer on her computer and go to google.com and run a search. Alice can also communicate with Billy using their private network. However, even though Billy's computer is connected to Alice's computer, Billy's computer is not connected to the Internet and cannot access the Internet. Again, Billy is not connected to an Internet Service Provider (e.g., Time Warner Cable) and he cannot go to google.com, nor can he go to 1800flowers.com to purchase flowers. DA 16, Lucantoni Non-Infringement Report ¶ 93.

As anyone who uses the Internet and the World Wide Web understands, being connected to the Internet, or having Internet access, has a generally understood meaning: a connection to an Internet Service Provider that allows one to run a browser program such as Internet Explorer to go to domain name addresses (sites) such as google.com and facebook.com and interact with the servers at those sites. DA 16, Lucantoni Non-Infringement Report ¶¶ 91, 94.

## Legal Standards

### Claim Construction Generally

The meaning of a patent and the terms of art within its claims are questions of law exclusively for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The claims of a patent define the invention to which the patentee has rights, *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), and the claim terms are typically given the ordinary

and customary meaning known by a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1312-13.

The claim language, however, does not stand alone. *Philips*, 415 F.3d at 1315. The Court should construe the claims in light of the specification, which "is always highly relevant to the claim construction analysis; [u]sually it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal quotation omitted). The Court should also consider the prosecution history along with the claim terms and the specification, which together form the patent's written record, i.e., the intrinsic evidence. *Id.* at 1317. Although the Court may consider extrinsic evidence, it is less persuasive than intrinsic evidence, and the Court should always "discount [extrinsic evidence] that is clearly at odds with the [patent's written record.]" *Id.* at 1317-18 (citations and quotations omitted).

**Construction of Means-Plus-Function Claim Terms**

Under 35 U.S.C. § 112 ¶ 6, a patentee may choose to draft system or apparatus claim elements in means-plus-function form. The statutory authority for such drafting is

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

A claim element is presumed to be written in means-plus-function form (and thus construed under § 112 ¶ 6) when the element includes the words "means for." Construing a claim element written in means-plus-function form is a two-step process: First, identify the function recited by the claim term. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F. 3d 1106, 113 (Fed. Cir. 2002). A claim term may not be impermissibly broadened by omitting claim limitations from the function. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). Second, identify the structure corresponding to the

function that is disclosed in the patent, if any. *Cardiac*, 296 F.3d at 1106. The corresponding structure is that structure necessary to perform the function. *Id.* The corresponding structure need not include all elements necessary for the claimed invention to work, but must include all structure that actually performs the claimed function. *Id.*

When the patent discloses that a function is performed by a "general purpose processor" or similar language, the corresponding structure for that function is the algorithm, if any, disclosed in the patent. *Aristocrat Tech. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Such an algorithm may be expressed as a flow chart, prose, or any other manner that provides sufficient structure to allow one of ordinary skill in the art to fully practice the invention without undue experimentation. *See, e.g., Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). The claim element should be construed to cover the algorithm or algorithms disclosed in the specification, plus any equivalents known at the time of the issuance of the claim. *See, e.g., Welker Bearing v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008).

**Person Of Ordinary Skill In The Art**

In his report, ATL's expert, Dr. Souri, contends that "a person of ordinary skill in the art of computer networking as of May 10, 1996, would have at least a Master's degree in electrical engineering, information systems, or a related field. This person would have had at least three years of work experience in the field." (DA 14, Souri Report, ¶ 8.)

Defendants disagree and believe that the relevant art is the networking of automated teller machines ("ATMs"), because the patents-in-suit relate to the inter-connection of ATMs. A person of ordinary skill in the art would have a college degree in a technical discipline and have at least 2 years experience in communications.

- 12 -

**Claim Constructions**

The '457 patent in suit includes 2 independent claims, 1 and 9, which are apparatus and

method claims respectively.  The 5 Continuation Patents each has only a single independent

apparatus claim.  The terms at issue for construction are from the independent claims.

| | | |
|---|---|---|
| **'457:** | **Claim 1:** | **"means for providing ..."** |
| | **Claim 9:** | **"providing Internet access ..."** |
| **All:** | | **"Internet"** |
| **All:** | **All** | **"Internet interface"** |

**Defendants' construction is as follows:**

| Patent | Claim | Claim Term | Defendants' Construction |
|---|---|---|---|
| '457 | 1 | means for providing a retail transaction to the consumer through an Internet interface to the automated teller machine | The claim term is in "means-plus-function" form, pursuant to 35 U.S.C. § 112 ¶ 6.<br><br>**Function**<br>allowing the consumer to access the Internet to complete a retail transaction over the Internet using the automated teller machine<br><br>**Structure**<br>a control screen, control means, a modem and an Internet interface" [no structure or algorithm disclosed for the control means] |
| '457 | 9 | providing Internet access to the consumer via the automated transaction machine and realizing a retail transaction | Same function as above |
| All | | Internet | A public network that is logically linked together by a globally unique address space |
| All | | Internet interface | Access to the Internet |

As a preliminary construction matter, claims 1 and 9 must be construed as having similar

scope (one as to apparatus, the other to the method) because ATL repeatedly so advised the

Patent Office during reexamination.  See JA 13 pg 883-4, 5/29/08 Reexam Response at pp. 4-5

and JA 13 pg 902, 5/29/08 Souri Decl. at ¶36; JA.13 pg 1198, Reexam Appeal Br. Dated 3/18/09 at p. 22.

ATL's constructions for these terms are purely litigation driven: they ignore the requirement to access the Internet to complete a retail transaction, and they even ignore the need for a "retail transaction" itself. For example, in ATL's claim construction of claim 1 of the '457 patent, it leaves the Internet out of the function of the "means," stating it is simply "to allow a consumer to engage in a retail transaction." As for the structure of the "means," ATL argues that it is simply the "Internet interface," as if that were a defined structure (which it is not) and as if it, by itself, magically allows a consumer to engage in a retail transaction without the need for the structure set forth in Figure 3b – the only disclosed structure therefor. ATL's construction for the corresponding method claim step, "provide Internet access to the consumer through which the consumer can realize a transaction," again reads the Internet out of the claim since all that is required is the ability to access the Internet and not actually realizing the transaction *over* the Internet. By contrast, as explained below, defendants' constructions are dictated by the intrinsic evidence, including the arguments made by the patentee to obtain allowance of the claims and should be adopted.

**TCP/IP Is Not The Internet**

As a preliminary matter, the term "Internet" must be construed, despite being readily understood even by lay people, because of ATL's litigation-driven, complex definition of this commonly understood term. Defendants set forth a simple yet accurate definition of the Internet based on the salient features relevant to this case – namely, that the Internet is the ubiquitous public network logically linked together by a globally unique address space. (In other words, no matter where Internet users are located on the network, accessing, for example, google.com always brings these users to that same globally unique address.) D.I. 149, Joint Claim Chart p. 4.

- 14 -

ATL's definition, by comparison, excerpted from a U.S. Government publication, is needlessly complex and detailed. The only apparent reason for using it, is that it mentions TCP/IP and gives ATL the opening for arguing the absurd notion that TCP/IP is the Internet or that any network that communicates using TCP/IP is the Internet.[2] Defendants contend that the definition of the Internet should not turn, as ATL repeatedly states and implies, on the usage of a certain protocol (i.e., TCP/IP). Indeed, ATL's own definition of "Internet" allows for the use of protocols other than TCP/IP. *Id.* The critical part of the definition, on which both ATL and Defendants agree, is that the Internet is a network that is "logically linked together by a globally unique address space." *Id.* The rest of ATL's definition is mere surplusage that will unnecessarily confuse the jury.

**"Internet interface" must mean Internet access**

As Defendants' expert Dr. Lucantoni explained, "Internet interface" cannot mean TCP/IP because *TCP/IP is not something that is connected to the output of a modem, as the Internet interface is shown in Figure 3b.* (See DA 17, Lucantoni Invalidity Report at ¶¶ 43-44.) Rather, as explained by Dr. Lucantoni, the only supported definition of "Internet interface" is simply – access to the Internet.

Indeed, if the patentee had intended Internet interface to mean TCP/IP, he would have used that well-known term in the '457 patent. Tellingly, Barcelou knew of TCP/IP and even referred to this protocol in his related patent, U.S. Patent No. 6,048,271, filed a few days before the '457 patent-in-suit. Barcelou's '271 patent specifically identifies TCP/IP as a support protocol and not an Internet interface. Col. 5, lines 11-13. DA 20. Obviously, therefore, the

---

[2] Although ATL's proposed claim construction does not refer to TCP/IP (it only states that the "means" is the "Internet interface"), ATL's expert reports make crystal clear that ATL intends to argue just that. Moreover, in his declarations, inventor Barcelou during prosecution of re-examination specifically states "NCR had an Internet interface, i.e., the TCP/IP (Communications) feature" [DA 15 Souri Supplemental Infringement Report ¶ 2, 4], or "every ATM offered by NCR had a TCP/IP protocol, i.e., an Internet interface." [Id.]

patentee knew the difference between a protocol and a network.  More importantly, the

disclosure common to all the patents-in-suit never mentions TCP/IP, or any protocols for that

matter, all of which were well known at the time the '457 application was filed.

Moreover, the patentee intended "Internet interface" to mean Internet access.  When the

asserted '457 claims were first presented to the Examiner, the independent apparatus application

claim 5 (later amended to become claim 1) recited only  "means for providing a transaction to

the consumer through an 'Internet interface'."  The patentee explained that this language

"specif[ies] integrated banking and retail transaction apparatus that includes an automated teller

machine and **means for providing Internet access to the consumer**."  (emphasis added) [JA 7,

pg 125, '457 FH 4/8/03 Amendment at p. 9]  That was the preferred embodiment of the

combination of the ATM and Internet kiosk shown in Figure 3b.  The similar language in

method claim 9 confirms this construction, of "providing Internet access to the consumer via the

automatic transaction machine."  In short, the file history of the '457 patent clearly defines

"Internet interface" as access to the Internet. DA 16, Lucantoni Non-Infringement Report ¶ 95.

**The Prosecution History Supports Defendants' Construction of the "means for providing . . ." and "providing Internet access . . ."**

With the terms "Internet interface" and "Internet" defined, we turn now to the function of

the means clause of claims 1 and the function of the method step of claim 9 in which those terms

are embedded.  The Examiner rejected all the claims under 35 U.S.C. §102(e) as anticipated by

USP 6,696,366 to Ziarno, commenting that "Ziarno discloses the use of his system with the

Internet which would embrace all limitation set forth in this claim [5]."  [JA 7 pg 134-35, '457

patent FH, Office Action dated 7/9/03 at pp. 3-4].

Faced with a reference that taught an integrated transaction machine that was connected

to the Internet, the patentee amended application claims 5 and 14 to recite "means for providing

a <u>retail</u> transaction to the consumer through an Internet interface <u>to the automated teller machine</u>"
and "providing Internet access to the consumer via the automated transaction machine <u>and</u>
<u>realizing a retail transaction,</u>" respectively.  (underlined portions show amended language) [JA 7
pg 138-39, '457 FH 1/9/04 Amendment].

Ziarno teaches a kiosk which accepts "contribution transactions" [Fig. 20] by cash or
credit card and sends information about the contribution over the Internet to a server.  [Fig. 15]
The patentee, in his remarks at page 8 of the Amendment, acknowledged that Ziarno's
transaction terminal was "downloading … through various types of connections including the
Internet ...." JA 7 pg 145.  To distinguish over Ziarno, the patentee amended the claims and
argued the importance of the "retail" limitation, stating that "Ziarno does not teach or suggest the
use of an ATM with an Internet connection to conduct a retail transaction." *Id.*  The patentee
also distinguished the claimed connection to the Internet from Ziarno's connection to the
Internet, stating "[i]n Ziarno, an Internet connection is used only to download information from
the terminal (100) [the kiosk] to be further processed.  A user/contributor never utilizes an
Internet connection to realize a retail transaction.  Therefore Ziarno does not teach or suggest the
claimed subject matter of independent claims 5 and 14." *Id.*

The patentee also provided an example of a retail transaction over the Internet when he
explained that in added claims 34-43 [issued as claims 28-37 of the '457 patent], "the Internet
connection allows access to a florist and a floral arrangement can be purchased."

After the claims were narrowed to require a connection to the Internet where the
consumer had access to the Internet to realize a retail transaction via the user interface of an
ATM, the Examiner allowed all of the '457 patent claims.  JA 7 pg 207-211, '457 Patent Notice
of Allowance, dated 1/14/2005.  Accordingly, as the foregoing establishes, means clause of

claims 1 and the method step of claim 9 must perform the function of "allowing the consumer to

access the Internet to complete a retail transaction over the Internet using the automated teller

machine."

**The Reexamination Confirms this Construction**

During reexamination of the '457 patent, ATL was again forced to argue the requirement

of Internet access in order to overcome the prior art cited by the Examiner.  For example:

Reexamination Response dated 12/19/07 (JA 13 pg 333, 336):
- "Indeed there is nothing in these references which would have suggested to one of ordinary skill in the art that **the Internet could be utilized** to create a multifunctional retail device from an ATM." Page 7 (emphasis added)
- "There is no suggestion that an ATM machine **connected to the Internet** would allow renewal of one's driver license." Page 7 (emphasis added)
- "The point of the above is that nowhere is there any suggestion that a device like an ATM can have its functions expanded to include a multitude of non-banking retail functions by being **connected to the Internet**." Page 10 (emphasis added)

Reexamination Response dated 5/29/08 (JA 13 pg 883-884)
- "... Saigh actually teach[es] <u>away</u> from **using the Internet** ..." Page 4 (emphasis added)
- "Nevertheless, claim 9 is of similar scope to claim 1 because claim 9 requires a single automated transaction machine comprising an automated teller machine, and **Internet access** to the consumer via the automated transaction machine for realizing a retail transaction." Pages 4-5. (emphasis added)
- "A person of ordinary skill in the art, upon reading this passage, would believe that **the Internet should not be used** with automated teller machines." Page 12. (emphasis added)  JA 13 pg 891

Reexamination Response dated 7/3/08 attached Souri Declaration (JA 13 pg 930):
- "In my opinion, Saigh does not teach giving customers **access to the Internet** through an automated teller machine." Para. 13 (emphasis added)
- "Saigh believed in 1996 that **the Internet was not a secure enough communication network** for copyright and proprietary information." Para. 15 (emphasis added)

Reexamination Appeal Brief dated 3/18/09 (JA 13 pg 1198):
- "**The Internet is accessed** through the touch screen.  Indeed, the internet is accessed through the very same touch screen used to access the automated teller machine." Page 22 (emphasis added)

Similarly, throughout the prosecution of the '457 patent, the patentee used the same

arguments for the two claims to distinguish over the prior art.  See JA 7 pg 127, Amendment

dated 4/8/03 at page 9 and JA 7 pg 145, Amendment dated 1/9/04 at page 8.  Moreover, ATL

expressly stated during reexamination that the scope of the two claims (i.e., Claim 1 and Claim 9) are similar. See JA 13 pg 883-884, 5/29/08 Reexam Response at pp. 4-5 and JA 13 pg 902, 5/29/08 Souri Decl. at ¶36; JA 13 pg 1198, Reexam Appeal Br. Dated 3/18/09 at p. 22. Accordingly, the functions of both Claim 1 and Claim 9 have similar scope.

Based on ATL's representations during prosecution of the '457 patent and during its reexamination, the proper construction for the function of the "means for providing a retail transaction to the consumer through an Internet interface to the automated teller machine" in claim 1 and the term "providing Internet access to the consumer via the automated transaction machine and realizing a retail transaction" in claim 9 is: allowing the consumer to access the Internet to complete a retail transaction over the Internet using the automated teller machine.

**Unless the structure for "Means for Providing . . ." is an Internet kiosk, no structure for this means clause is disclosed**

Having defined the function for these asserted means clauses, the issue now turns to identifying the structure disclosed in the specification to perform these functions. The only disclosed structure in the patents-in-suit for the means for providing . . . is an Internet kiosk. The "Summary of the Invention" refers to the combination of an ATM and an Internet kiosk in an integrated housing as follows:

> The integrated system generally avoids duplicating hardware or functions in the course of delivering the goods or services offered, so for-example in a combination ATM and Internet kiosk the same credit card or smart card reader is used for both the ATM and the Internet kiosk functions, the same control screen activates the ATM functions and the Internet functions, and etc. (JA 1, '457 patent, Column 1, lines 48-55.)

Although Figure 3b of the '457 patent (excerpted below) arguably depicts an Internet kiosk," there is no description in the patents of the kiosk's constituent parts "Internet Interface" (other than as detailed above as Internet access) and "Control Means."



FIG. 3b

The structure linked to the function of "allowing the consumer to access the Internet to complete a retail transaction over the Internet using the automated teller machine" is that shown in Figure 3b, namely, the control screen, the control means, the modem and the Internet interface. See JA 1 at column 4, lines 42-43  The control means operatively connects the control screen, modem and Internet interface so that the Internet can be accessed by the consumer to complete a retail transaction.

The control means, however, is utterly undefined as no further explanation is provided except for the single depiction in Fig, 3b.  At best, the only structure disclosed therefore is the referenced Internet kiosk described above in the Summary of the Invention.  Attributing any further meaning would be arbitrary and indefinite.  Even if the Court gives ATL the benefit of the doubt and construes "control means"under 35 U.S.C. § 112 ¶6, the claim would still be indefinite.  As to that element, it is presumably a programmed processor such as a computer (we say presumably, because the specification does not say what it is.)  Under controlling Federal Circuit law, to comply with Section 112, the algorithm for such a processor must be disclosed. *Aristocrat*, 521 F.3d at 1333.  Although the disclosure may take any of several forms (computer

listing, flow chart, etc.), there is absolutely no algorithm in any form in the '457 patent. Hence the term is indefinite.

**ATL's proposed structure for the means clause is without support**

ATL's position that the "Internet interface" is the corresponding structure for the "means for providing a retail transaction to the consumer through an Internet interface to the automated teller machine," is contrary to the specification, the arguments made during prosecution and the representations made to the USPTO during reexamination. In fact, when ATL filed its March 18, 2009 Appeal Brief in the re-examination, in order to comply with Section 1205 of the MPEP (which requires the appellant to set forth the structure corresponding to any means plus function term), ATL stated at page 4:

> "The means plus function language of claim 1 can be accomplished by, for example, combining an automated teller machine with an Internet kiosk." (JA 13 pg 1180)

Although ATL said that this Internet kiosk (as shown in Figure 3b) was an "example" of the structure corresponding to the "means," they never said that the structure was the "Internet interface" alone.

As explained above, the Internet interface, based upon its position in Figure 3b downstream of the modem, cannot be anything other than access to the Internet. [DA 17, Lucantoni Invalidity Report ¶ 43. ATL, in contrast, construes "Internet" and "interface" separately, using the dictionary definition for each, which is completely out of context of the patent disclosure which shows the "Internet interface" in Fig. 3b as a box at the output of the modem. As noted, Dr. Souri has never identified what is in the box, but both the inventor David Barcelou and the prosecuting attorney stated during prosecution that the Internet interface is TCP/IP. JA 13 pg 1219, '457 Reexamination FH Appeal Brief, p. 43 ("In 2005, another NCR brochure shows that *every* ATM offered by NCR had a TCP/IP protocol, i.e., an Internet

interface."); *Id.* at 1105, Declaration of David Barcelou, ¶ 11 ("Almost a decade later, however, every automated teller machine sold by NCR had an Internet interface, i.e. the TCP/IP 'Communications' feature."). As analyzed and explained by Dr. Lucantoni on his expert report, the placement of the Internet interface box at the output of the modem makes it a technical impossibility for it to be "TCP/IP." DA 17, Lucantoni Invalidity Report ¶ 44. It is simply what the patentee told the Examiner it was: access to the Internet.[3]

In short, the Court should accept Defendants construction supported by all the intrinsic evidence, and reject ATL's strained, litigation-driven construction.

**retail transaction**
**retail ATM service**

| '457 | All | retail transaction | a non-banking transaction for a consumer good and/or service |
| '457 | All | banking services | transactions customarily performed by an ATM |
| '850 | All | retail ATM service | a non-banking transaction for a consumer good and/or service |
| '420 | | | |
| '158 | | | |
| '248 | | | |
| '677 | | | |

Defendants submit that a "retail transaction" is a non-banking transaction for a consumer good and/or service, that is, a transaction not customarily performed by an ATM. The term "retail ATM service," which is nowhere mentioned in the patents-in-suit, other than in the claims of the Continuation Patents, has no support other than as a retail transaction and therefore should be construed to be the same as "retail transaction." ATL in contrast, ignores the file history and construes retail transaction as "a transaction between a business and a consumer" (which of

---

[3] Plaintiff's expert, Dr. Souri, contends that "Internet interface" is a term of art and states that it is the "point[s] of interaction of the device to the Internet." However, he does not provide even a single instance of anyone else using this term or assigning that definition to the term, nor does he explain what is the "point of interaction." So we are left to guess whether he means it is a connecter, a cable, a circuit or something else. In any event, for the purposes of validity, Dr. Souri consistently refers to the Internet interface as "the Internet," so that should suffice for claim construction as well.

course would include banking transactions) and construes "retail ATM service" as a "ATM service for consumers" (which again includes banking transactions).

As discussed in the above analysis of the prosecution of the '457 patent, the limitation "retail" was added to patent claims 1 and 9 in the Amendment dated 1/9/04. In that Amendment at page 7, the patentee stated that "[t]he present invention is generally related to providing the capability of conducting retail transactions on an integrated transaction machine" which "expands the capabilities of automated teller machines" for example "by offering banking services through the automated teller machine and the ability to conduct retail transactions." Accordingly, retail transactions are distinct from banking services, which are customarily performed by an ATM.

That the retail transactions were non-banking transactions, can be seen from the patents-in-suit. The '457 patent itself describes prior art ATM machines that dispense stamps (Col. 1, lines 29-30). It also states that prior art ATM machines dispensed bills and coins, and offered services such as check cashing, but described the ability to dispense stamps as a "retail sales option" (Column 2, lines 55-58) and "retail functions." (Column 1, lines 27-32).

Moreover, during reexamination, ATL argued in a Response dated 12/19/07 at page 7 (JA 13 pg 333):

> "How, given the state of the art, would one conceive of an ATM machine becoming a multi purpose device capable of **not only performing banking functions**, but by utilizing an Internet interface [sic] provide **other retail goods or services** to a consumer?" (emphasis added)

In that same response at page 10, ATL wrote (JA 13 pg 336):

> "The point of the above is that nowhere is there any suggestion that a device like an ATM can have its functions expanded to include a **multitude of non-banking related retail functions** by being connected to the Internet."

As for "retail ATM service," the claims of the Continuation Patents all recite an "integrated banking and transaction machine." An integrated machine is one that combines an ATM and a retail transaction kiosk such as an Internet kiosk. Accordingly, the retail ATM service, like the retail transaction, has to be a non-banking transaction. If a retail ATM service were merely a banking transaction, then the machine would not be an "integrated" banking and transaction machine. The patents-in-suit make this clear:

> "However, the preferred embodiments of the present invention include an **integrated** but otherwise traditional **ATM**, so as to enhance the overall retail sales and services offering by coordinating payment arrangements and **generalized banking services with the retail transaction(s). This combination of providing an ATM with other retail goods and services transactions is not only new,** but would heretofore have been considered virtually heretical.

> The essence of the preferred embodiments of the invention thus resides in the new combination of previously existing but separate means of access to the stream of daily commerce and banking. **Meaningful combinations of ATMs and customer retail kiosks have never even been attempted before...**" JA 1, Column 2, lines 35-48 (emphasis added)

ATL's use of the term "retail ATM service" during prosecution of the Continuation Applications is consistent with the use of "retail transaction" in the '457 claims and contradicts ATL's construction of "ATM service for consumers." For example, in distinguishing over the Gullman patent, which teaches an ATM, in an Amendment dated 10/6/09 in continuation application 11/981,969, the patentee stated at page 5 that:

> "**While the access device (12) [in Gullman] can be an automated teller machine,** <u>see</u> col. 3, lines 29-32, **no provision is made for 'retail ATM service'.** Therefore, since 'retail ATM service' is a required element of claim 16 (and dependent claims 21-23, 27 and 30), and this element is not taught by the cited art, the cited art does not render these claims obvious." (emphasis added) DA 24 pg 295

Thus, because an ATM performs banking services, patentee argues that Gullman did not teach non-banking transactions. Accordingly, by making this argument, ATL interpreted "retail ATM service" exactly like the "retail transaction" used in the '457 Patent claims, which means a non-

banking transaction for a consumer good and/or service. ATL made this same argument

regarding "retail ATM services" in an Amendment dated 6/16/10 in continuation application

11/982,044. ATL stated (with respect to the Examiner's rejection over U.S. Patent No.

4,497,261 to Ferris) (DA 22 pg 293):

> The Examiner also alleges that Ferris discloses "access to the automated teller machine user interface whereupon the consumer may selectively dispense cash using the integrated banking and transaction machine providing the retail automated teller machine service," as recited by Claim 16. *Final Office Action*, p. 4. More specifically, the Examiner alleges that Ferris's disclosure of "dispens[ing] money" is equivalent to this recited feature. Applicant respectfully disagrees with this allegation and submits that the Examiner fails to consider the entire recitation, which provides that cash may be dispensed using the "integrated *banking and transaction machine* providing the *retail* automated teller machine service" (emphasis added). In other words, what is recited is an integrated machine that dispenses cash and provides a *retail teller machine service*. Ferris discloses no such machine, as no retail teller machine services are disclosed or suggested by Ferris.

In short, it could not be clearer that "retail ATM service" is **not** a banking transaction or

ATM service, but rather a non-banking retail transaction of consumer goods and/or services.

Accordingly, defendants' construction for retail transactions and retail ATM services as "non-

banking transactions for a consumer good and/or service" and defendants' construction for

"banking services" as transactions customarily performed by an ATM, should be adopted.

**Means for identifying the user to the automated teller machine, further comprising a smartcard/magnetic stripe reader/encoder and a sensor**

| Patent | Claim | Claim Term | Defendants' Construction |
|---|---|---|---|
| '850 | 1 | means for identifying | The term is written in "means-plus-function" |
| '420 | 1 | the user to the | form, pursuant to 35 U.S.C. § 112 ¶ 6. |
| '158 | 1 | automated teller | |
| '248 | 1 | machine, further | **Function** |
| '677 | 1 | comprising a | identifying the user to the automated teller |
| | | smartcard/magnetic | machine |
| | | stripe reader/encoder | |
| | | and a sensor | **Structure** |
| | | | a smartcard reader and encoder, a magnetic |

| | | | stripe reader and encoder, a sensor, and a control means operatively connected thereto [no structure or algorithm disclosed for control means] |
|---|---|---|---|

The parties agree that the claim term is in means plus function form, but differ on the required structure. Defendants contend that the structure is the structure recited in the term itself, the smartcard/magnetic stripe reader/encoder and sensor, both of which are used to identify the user and the "control means" discussed above and which is the element required to provide the identifying information from an ATM card to the "automated teller machine." ATL by contrast, ignores the plain language of the claims and says that it is "virtually any means or device to identify a user ...." For the same reasons as argued above for the means recited in claim 1 of the '457 patent, there is no disclosure of the structure or the algorithm for the control means and therefore the means for identifying is indefinite under 35 U.S.C. § 112.

**Smartcard/magnetic stripe reader/encoder**

| Patent | Claim | Claim Term | Defendants' Construction |
|---|---|---|---|
| '850 | 1 | a smart card/magnetic stripe reader/encoder | Smartcard reader and encoder and magnetic stripe reader and encoder |
| '420 | 1 | | |
| '158 | 1 | | |
| '248 | 1 | | |
| '677 | 1 | | |

The principal issue with respect to this term is the meaning of the "/." ATL contends that it means "and/or." Defendants contend that, based on its usage in the claims, arguments made by ATL and its expert during the reexamination, and the way in which the Examiner in the Continuation Applications construed the "/" with ATL's blessing, it can only mean "and." Accordingly, defendants construe the term with that definition.

Significantly, during the reexamination, the Examiner contended that the language "smartcard/magnetic stripe interface" in claim 10 meant smart card or magnetic stripe interface.

In a response dated 12/19/07 (JA 13 pg 347), the patentee submitted a declaration by Dr. Souri who stated :

> "The Examiner incorrectly interprets the term 'smartcard/magnetic stripe interface' as 'smartcard **or** magnetic stripe interface". The patent clearly shows both smartcard **and** magnetic stripe means as available in an ATM . . . The ATM is fitted with a smart card reader/encoder, so that in addition to the traditional bill dispenser the ATM can dispense encodable currency") Paragraph 33. (citing '457 patent column 3, lines 21-24; emphasis in original)

By so arguing, Dr. Souri made two admissions: First, that "smartcard/magnetic stripe" means "smartcard *and* magnetic stripe." Second, that "reader/encoder" means "reader *and* encoder" (by asserting that the smart card reader/encoder can "dispense encodable currency," i.e., encode currency on the smart card). In short, Defendants' construction comports with Dr. Souri's arguments to the Examiner.

Another example is the way the Examiner interpreted that language in continuation application 11/981,963. The Examiner rejected the claims in an Office Action dated 10/31/08, stating at page 6 with respect to the "means for identifying the user to the automated teller machine, further comprising a smart card/magnetic stripe reader/encoder and sensor" stating "Lawlor teaches as disclosed above [the smart card reader], but it does not teach explicitly about a 'magnetic stripe reader', 'magnetic stripe encoder', and a 'sensor'." DA 21 pg 175.

The Examiner thus clearly understood the term "smart card/magnetic stripe reader/encoder" as requiring a smart card reader, smart card encoder, magnetic stripe reader **and** magnetic stripe encoder. In the Amendment filed on 4/21/09, the patentee did not contest the Examiner's construction of this claim element, which made sense because the Examiner's construction conformed to the patentee's own prior construction during the reexamination. DA 21 pg 276. Accordingly, the "/" should be construed as "and." Therefore, "smart card/magnetic

stripe reader/encoder" requires a smart card reader, smart card encoder, magnetic stripe reader **and** magnetic stripe encoder.

ATL contends that "/" means "and/or." That makes no sense in the context of the patents-in-suit. The specification, as cited to the Examiner by Dr. Souri, specifically states that the "ATM is fitted with a smart card reader/encoder, so that in addition to the traditional bill dispenser the ATM can dispense encodable currency onto a smart card. . . ." '457 patent, column 3, lines 21-24. Of course, to "dispense encodable currency", the ATM needs both a smartcard reader and encoder, because encodable currency cannot be dispensed by just a reader. Thus, it is clear as daylight that the use of "/" can only mean "and," just as ATL stated during the re-examination of the '457 patent.

**Magnetic Stripe Card**
**Smartcard**
**Sensor**

| Patent | Claim | Claim Term | Defendants' Construction |
|--------|-------|------------|--------------------------|
| '850 | 1 | smartcard | A transaction card with an electronic chip in which data can be encoded and from which data can be read |
| '420 | 1 | | |
| '158 | 1 | | |
| '248 | 1 | magnetic stripe card | A transaction card with a magnetized stripe into which data can be encoded and from which data can be read |
| '677 | 1 | | |
| | | sensor | A motion, sound and position sensor |

The patents-in-suit refer to the magnetic stripe card reader as traditional ATM hardware. Col. 3, lines 17-19. Accordingly, the magnetic strip card is a conventional ATM card. The '457 patent also refers to the smartcard reader/encoder as conventional (Col. 3, lines 21-24), so that the smart card is conventional as well. The definitions for the terms "magnetic stripe card" and "smart card" are the generally accepted definitions for these terms. DA 18, Stanners Report at 26-27. ATL provides no construction for these terms.

As for the sensor, since it is part of the "the means for identifying the user to the automated teller machine," we look to the specification for the linked structure. The only sensor

mentioned in the patents-in-suit is the motion, sound and position sensor referred to at Column 4,

lines 62-64 and Column 5, lines 7-8. Accordingly, that is the sensor used to identify the user.

ATL, in contrast, contends that the sensor is "anything that senses the presence of the user." That

construction, of course, ignores the function of the means which comprises the sensor: to identify

the user to the ATM machine.

**encryption services**
**security services**
**network services**

| Patent | Claim | Claim Term | Defendants' Construction |
|--------|-------|------------|--------------------------|
| '850 | 1 | encryption services | retail encryption services |
| '420 | 1 | security services | retail security services |
| '158 | 1 | | |
| '248 | 1 | | |
| '677 | 1 | | |
| '248 | 1 | network services | Retail network services |

All three of these terms are used in the claims of the Continuation Patents. Defendants

submit that all three are defined in the Patents-in-suit as retail services. See JA 1, '457 patent,

column 3, lines 37, 53 and column 4, lines 1-2. The only antecedent for these three terms is the

list of "retail services." Therefore, their construction should be retail encryption services, retail

security services and retail network services, respectively. ATL, by contrast, does not construe

these terms.

ATL apparently contends that these terms should be given their ordinary meaning

(whatever that is), but the patent disclosure is to the contrary, and gives these terms a special

meaning of "retail services." By cherry-picking these terms from the list of retail services and

dropping them into the claims and out of context, ATL attempts to give these terms meanings

that the patentee never intended, namely, the "encryption," "security" and "network" provided

by the ATM itself, such as when the ATM encrypts your ATM card number and PIN code before

sending them over a secure network to your bank. That meaning is never disclosed in the '457

patent and was never intended by the list of "retail services" in the patents-in-suit. Accordingly,

defendants' construction for these terms should be adopted.

**Intranet connection**
**Internet connection**
**Financial network connections**

| Patent | Claim | Claim Term | Defendants' Construction |
|--------|-------|-----------|--------------------------|
| '850 | 1 | Intranet connection | Retail intranet service |
| '420 | 1 | | |
| '158 | 1 | Internet connection | Retail Internet service |
| '248 | 1 | Financial network connections | Retail financial services |

Defendants contend that these terms mean retail intranet services, retail Internet services

and retail financial services, respectively. As with the previous terms, the list of retail services in

Columns 3-4 of the patents-in-suit includes Intranet services, Internet services, and financial

services. Column 3, lines 41, 50 and 63. There is no mention anywhere in the patents-in-suit of

an "intranet connection" or "financial network connections." With respect to "Internet

connection," the patents-in-suit do refer to an Internet connection of a personal computer

(column 4, lines 8-13), but that is the meaning of Internet interface and the term Internet

connection is used in the claims only in conjunction with Internet interface. Therefore it must

mean something else, and that is the retail Internet services that is listed in Column 3.

ATL simply construes the terms "financial network," "Internet" and "Intranet," ignoring

the term "connection" and ignoring the context in which the terms "financial network,"

"Internet" and "Intranet" are used and described in the patents-in-suit. By cherry picking the

words from the list of retail services and dropping them into the claims out of the context of

retail services, ATL attempts to give the terms "intranet connection" and "financial networks

connection" meanings that are contrary to their use in the patent specification. ATL is trying to

assert that these terms are simply "intranet" and "financial networks" and consequently, seek

construction of the terms "intranet" and "financial network" alone, as if they were disclosed as

such in the patents-in-suit, which they are not. The use of "Internet connection" is an apparent

attempt to change the meaning of Internet interface from that established in the '457 file history

to something broader (i.e., TCP/IP). Defendants therefore urge the Court to construe these terms

as they are defined in the patents-in-suit: as retail services and not networks *per se*.

**Internet interface to the World Wide Web**
**World Wide Web**

| Patent | Claim | Claim Term | Defendants' Construction |
|--------|-------|------------|--------------------------|
| '677 | 1 | Internet interface to the World Wide Web | Connected to the World Wide Web on the Internet |
| | | World Wide Web | An application built on top of the Internet, and is a system of interlinked hypertext documents accessed via the Internet |

For the term "World Wide Web," defendants have used ATL's own definition provided

to the USPTO during the prosecution file history of continuation application 11/982,241 that led

to the '677 patent in suit. At page 2 of an Amendment dated 6/4/09 (JA 12 pg 194), ATL

explained to the Examiner the difference between the World Wide Web and the Internet. In

doing so, ATL defined the World Wide Web as "an application built on top of the Internet, and is

a system of interlinked hypertext documents accessed via the Internet." *Id.* Defendants have

adopted that definition in their construction. ATL, by contrast, simply construes World Wide

Web and uses a definition "an interlinked set of information sources on the Internet" which

differs from that proffered to the Examiner during prosecution.

As to the term "Internet interface to the World Wide Web," the only antecedent in the

patents-in-suit is the reference to the orientation of the touchscreen 44 so that it is suitable for

"relatively long, single-column selection menus such as those of the World Wide Web on the

Internet ...." JA 1, '457 Column 5, lines 15-18. Based on the construction of the term "Internet

interface" as Internet access and the reference to the fact that the World Wide Web as "on the

Internet," the proper construction for this tem is "connected to the World Wide Web on the Internet."

**"Composite" Terms of Claim 1 of the Continuation Patents**

| Patent | Claim | Claim Term | Defendants' Construction |
|---|---|---|---|
| '850 '420 | 1 1 | an Internet interface to an Intranet connection to the automated teller machine that uses encryption services and security services to provide the user access to the user interface and retail ATM service; | The automated teller machine is connected to the Internet through a retail Intranet service and the consumer can access the Internet using the automated teller machine user interface and retail security and encryption encryption services to access a retail service over the Internet. Even construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '158 | 1 | an Internet interface to an Internet connection to the automated teller machine that uses encryption services and security services to provide the user access to the user interface and retail ATM service; | The automated teller machine is connected to the Internet through a retail Internet service and the consumer can access the Internet using the automated teller machine user interface and retail security and encryption encryption services to access a retail service over the Internet. Even construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '677 | 1 | an Internet interface to the World Wide Web to the automated teller machine that uses encryption services and security services to provide the user access to the user interface and retail ATM service; | The automated teller machine is connected to the World Wide Web on the Internet and the consumer can access the World Wide Web using the automated teller machine user interface and retail security and encryption encryption services to access a retail service over the Internet. Even construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '248 | 1 | network services to financial network connections to the automated teller | The automated teller machine is connected to retail network services through retail financial services and the consumer can access a retail service using the automated teller machine user |

| | | machine that use encryption services and security services to provide the user access to the user interface and retail ATM service; | interface and retail security and encryption encryption services and the retail network services and retail financial services.<br><br>Even construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| --- | --- | --- | --- |

Each of the above terms have been construed by substituting the corresponding "retail service." As can be seen from the above each of the claims includes the language:

> "to the automated teller machine that uses encryption services and security services to provide the user access to the user interface and retail ATM service. . ."

As properly construed, therefore, the claims would require an ATM that uses "retail services" to provide the user access to "retail services." That makes no sense. ATL simply cherry-picked the terms "encryption" services and "security" services from the list of retail services and dropped them into the claims out of context, attempting to give those terms meanings that the patentee never intended, namely, "encryption" and "security" provided by the ATM itself (e.g., when the ATM encrypts your ATM card number and PIN code before sending them over a secure network to your bank). That meaning is never disclosed in the '457 patent and was never intended by the list of "retail services" in the patents-in-suit. Because the claims merely string together a series of "retail services," the meanings of the claims are hopelessly ambiguous and thus the claims are indefinite under 35 U.S.C. § 112 ¶ 2.

**"Purchase access" Composite terms of Claim 1 of the Continuation Patents**

| Patent | Claim | Claim Term | Defendants' Construction |
| --- | --- | --- | --- |
| '850<br>'420 | 1<br>1 | wherein the consumer can purchase access to the retail ATM service through use of the user interface, Intranet and Internet connections. | The consumer can access the retail service over the Internet by buying the retail Intranet service.<br><br>If this term is not construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '158 | 1 | wherein the consumer | The consumer can access the retail service over |

| | | | |
|---|---|---|---|
| | | can purchase access to the retail ATM service through use of the user interface and Internet services connections. | the Internet by buying the retail Internet service.<br><br>If this term is not construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '677 | 1 | wherein the consumer can purchase access to the retail ATM service through use of the user interface and the World Wide Web connections. | The consumer can access the retail service on the World Wide Web by buying access to the Internet.<br><br>If this term is not construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |
| '248 | 1 | wherein the consumer can purchase access to the retail ATM service through use of the user interface and financial network connections. | The consumer can access the retail service over the retail network services by buying the retail financial services.<br><br>If this term is not construed as set forth above, it is indefinite under 35 U.S.C. § 112 ¶ 2 as being insolubly ambiguous. |

The term "purchase access" is used in all of the independent claims of the Continuation Patents. The term is not used anywhere in the '457 specification. The only support for the use of the term is from the disclosed embodiment of the ATM and Internet kiosk. In the Internet kiosk part of the machine, one purchases access to the Internet: you insert your credit card and buy time to go on-line. DA 17, Lucantoni Invalidity Report ¶ 47; Lucantoni Non-Infringement Report ¶ 36. That is a retail transaction: you are paying for a retail Internet service. You may for example, after buying the Internet service, go to 1800flowers.com and buy flowers, i.e., another retail transaction. This two part transaction of purchasing access (retail Internet service) to a retail ATM service (buying flowers) is what is referred to in the last limitation of each independent claim of the Continuation Patents.

Here again, each of the above terms is a composite of the cherry picked language from the list of retail services in the patents-in-suit. As defendants have defined each of the individual retail service terms, defendants have again attempted to make some sense out of the composite

language where these terms are concatenated.  Unless the terms are construed as set forth in the

charts, they are hopelessly vague and insolubly ambiguous such that it is impossible to determine

the scope of the claims from reading the specification and are indefinite under 35 U.S.C. § 112.

**"selectively dispense ..."**

| Patent | Claim | Claim Term | Defendants' Construction |
|--------|-------|-----------|--------------------------|
| '850 | 1 | whereupon the consumer may selectively dispense encodable credit | The consumer can choose to dispense one of at least two options including . . . |
| '420 | | . . . encodable currency | . . . encodable currency |
| '158 '677 | 1 | whereupon the consumer may selectively dispense currency | The consumer can choose to dispense one of at least two options including . . . |
| '248 | 1 | . . . cash | . . . cash |

The term "wherein the consumer may selectively dispense" means exactly what the claim

term says: the consumer decides what form the dispensing will take out of two or more options,

i.e., currency (cash or bills), encodable currency, digital cash or encodable credit.  JA 13 pg

1076.  Reexamination response dated 1/16/09 at page 9.  That is the plain meaning of the

language.

ATL, by contrast, reads out of the term the requirement that the consumer make the choice and

that the choice must include at least the form recited in the claim, by merely choosing to construe

"selectively dispense" out of the context of the language of the claim.  Accordingly, defendants'

construction for each of the terms set forth in the chart above, should be adopted.


**CONCLUSION**

For the foregoing reasons Defendants ask that the Court adopt all of their claim

constructions and reject Plaintiff's proposed constructions.

- 35 -

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Eric J. Lobenfeld
Ira J. Schaefer
Arun Chandra
Brian G. Strand
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Tel: (212) 918-3000

Dated: October 8, 2010
Corrected Version Dated: October 18, 2010
Public Version Dated: October 28, 2010
987634 / 30232

By: /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants-Counterclaimants*
*IYG Holding Co., 7-Eleven, Inc., Vcom*
*Financial Services, Inc. and Cardtronics USA,*
*Inc.*

- 36 -

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 28, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on October 28, 2010, I have Electronically Mailed the document to the following person(s):

Frederick L. Cottrell, III
Kelly E. Farnan
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Cottrell@rlf.com
farnan@rlf.com

Albert L. Jacobs, Jr.
Gerrard F. Diebner
Daniel A. Ladow
Timothy M. Salmon
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0700
Albert.Jacobs@troutmansanders.com
Gerard.Diebner@troutmansanders.com
daniel.ladow@troutmansanders.com
timothy.salmon@troutmansanders.com

Jeffrey C. Morgan
Seyed Kaveh E. Rashidi-Yazd
Troutman Sanders LLP
600 Peachtree St NE, Suite 5200
Atlanta, GA  30308
Jeffrey.morgan@troutmansanders.com
kaveh.rashidi-yazd@troutmansanders.com

By:  */s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

767228 / 30232

2